UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

TERRENCE WINSTON                           CIVIL ACTION NO. 23-cv-818

VERSUS                                     JUDGE DAVID C. JOSEPH

HORSESHOE ENTERTAINMENT                    MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Terrence Winston ("Plaintiff") filed this civil rights action against Horseshoe Entertainment based on allegations that he was discriminated against based on his race during a stay at the Horseshoe Hotel. Before the court is Horseshoe's Motion to Compel Arbitration and to Dismiss for Failure to State a Claim (Doc. 8) that invokes an arbitration provision in a hotel receipt and challenges the merits of Plaintiff's several federal and state law claims. For the reasons that follow, it is recommended that the motion be granted in part and denied in part.

**Relevant Facts**

Most of Horseshoe's attacks on the complaint are for failure to state a claim on which relief may be granted. When ruling on such a motion, "a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007). According to Plaintiff's complaint, he visited the Horseshoe Hotel on July 1, 2022 as a patron and paid guest. Plaintiff describes himself as a 60-year-old African American who is a retired United States Navy Chief Petty Officer and military law

enforcement officer who is qualified for a veteran's disability due to hearing loss and tinnitus. He lives in Maryland but was visiting the Horseshoe Hotel and Casino in Bossier City, Louisiana. Complaint, ¶¶ 1-11.

Horseshoe has "implemented policies and practices that deny African American patrons, on account of their race … the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the establishments known as the Horseshoe Hotel. These policies and practices discourage and/or deny African American customers … admission to these establishments while offering admission to similarly situated white patrons. This policy has been implemented with particular force since the tenure of General Manager, Robert Urland, a white male, who upon information and belief articulated an intent to keep African Americans from the swimming pool area and out of the swimming pool or other public areas as part of a governing policy." ¶ 11.

During Plaintiff's stay at the hotel, he decided to go for a swim at the hotel swimming pool. A "pool rules" sign was posted at the entry of the pool area, and Plaintiff complied with the posted rules. ¶ 12. A white female staff person immediately approached Plaintiff when he entered the swimming area and said, "I need to see an ID." Plaintiff showed the woman his hotel room key, gave her his full name, and said that he was staying in Room 1815 of the hotel. Plaintiff noticed that he was the only African American in the swimming area and that white patrons were being allowed to access the pool without being required to show picture identification. ¶ 13. The female staffer demanded again to see Plaintiff's picture identification. He replied that he did not bring his wallet to the pool, and he said that he had traveled around the world and never been asked for picture identification

when he was a guest at a hotel.  He asked to speak to the manager of the pool area.  ¶ 14-15.

Plaintiff was escorted to a white male who identified himself as the manager of the pool.  Plaintiff told the man that he was a paid guest, showed him his room key, and provided his full name and room number.  The man insisted that Plaintiff needed to show picture identification.  Plaintiff requested that a supervisor be called.  ¶ 16.

Plaintiff then proceeded to enter the pool area and began swimming laps.  When he finished and was exiting the pool, he noticed that numerous people were in the area.  One of them asked Plaintiff if he had heard him tell Plaintiff to get out of the pool.  Plaintiff said that he did not hear such a request, and he continued to put on his shoes as he prepared to leave the area.  ¶¶ 17-18.

The man who spoke to Plaintiff, who had not identified himself as a police officer, told Plaintiff that he was under arrest.  Plaintiff responded, "Are you kidding me? Under arrest for what? If you want me to leave, I'll leave."  The man ordered Plaintiff to stand up, and Plaintiff did.  The man grabbed Plaintiff's right wrist, which forced Plaintiff on the ground and caused him to fall on a patio chair.  The man leaned on top of Plaintiff and proceeded to handcuff Plaintiff and yell, "Deploying OC" (referring to pepper spray).  Plaintiff told the officer that his hands were visible, in an effort to deter being sprayed.  (Plaintiff does not allege whether the spray was actually used on him.)  A security officer employed by Horseshoe, believed to be Robert D. Prime, placed his fist and knee on Plaintiff's back after Plaintiff had been restrained and handcuffed.  The arresting officer remarked, "You're a cop.  You're acting like a crook."  ¶¶ 19-20.

Plaintiff was escorted to the front of the hotel and spoke to a person who identified himself as a sergeant with the Bossier City Police Department. The sergeant said that Plaintiff was required to produce his identification to Horseshoe for "safety reasons" and accused Plaintiff of cursing at Horseshoe's employees. Plaintiff alleges that this was the first mention of a need to produce ID for safety reasons. The sergeant asked a white male security officer, Michael Golden, if Horseshoe wanted to press charges. Golden, who Plaintiff alleges is Horseshoe's director of security/food and beverage, yelled, "Absolutely, I wanna press charges. No sir. I wanna press charges." General Manager Robert Urland and Senior Director of Food and Beverage Boris Skocibusic were also present when Golden directed that Plaintiff be charged. Plaintiff alleges that similarly situated white persons have engaged in more egregious conduct and were not arrested. ¶ 21.

Plaintiff was escorted to a police cruiser and taken to the Bossier City jail. He was charged with "Entry on or Remaining After Being Forbidden and Resisting an Officer." After a couple of hours in a holding cell, Plaintiff had chest palpitations and a severe headache. He related those facts to a holding cell camera monitor, and a jail attendant took Plaintiff's blood pressure, which registered 205/125. The attendant phoned a supervisor, EMS arrived, and EMS found Plaintiff's blood pressure to be 220/130. ¶¶ 22-23.

Plaintiff was handcuffed and shackled and transported by ambulance to Ochsner LSU Health Shreveport, where he was seen by a physician in the emergency room. Plaintiff remained in handcuffs and shackles while being examined. The physician stated that Plaintiff's blood pressure was so high that he was in danger of having a stroke and needed his prescribed medication that had been left in his hotel room. The physician also

stated that Plaintiff needed to have his blood pressure checked every three hours. He asked if Plaintiff had someone who could go to the hotel to retrieve his medication. Plaintiff had asked earlier for a friend to get the medication, but Horseshoe denied the friend access. Plaintiff gave permission to the police to collect his medication. (He does not allege whether he was then given the medication or whether he suffered any further health issues.) Plaintiff was later released from jail, and all charges against him have since been resolved. ¶¶ 24-26.

Plaintiff's memorandum in opposition asked that he be allowed to amend his complaint if it is found lacking. The court issued an order and allowed Plaintiff an opportunity to amend his complaint and plead his best case. He was told that not amending would mean he was deemed to stand on his original complaint. Doc. 13. Plaintiff did not attempt to amend his complaint.

**Arbitration**

Horseshoe argues that a paper presented to Plaintiff when he checked into the hotel requires that he arbitrate the claims presented in this action. To assess whether a claim must be arbitrated, the court follows a two-step analysis. "The first is contract formation— whether the parties entered into *any arbitration agreement at all*." Kubala v. Supreme Prod. Servs., Inc., 830 F.3d 199, 201 (5th Cir. 2016). "The second involves contract interpretation to determine whether *this* claim is covered by the arbitration agreement." Id. Both steps are questions for the court unless the alleged arbitration agreement contains a delegation clause that gives the arbitrator the primary power to rule on the arbitrability of

a specific claim.  Id.  Neither party argues that such a delegation clause is at issue in this case.

Horseshoe submits a single page that was apparently presented to Plaintiff when he checked into the hotel.  It contains standard information such as the room number, arrival and departure dates, and the number of persons in the party.  Plaintiff apparently initialed in areas beside that information as well as in a box with room rate information.  He also initialed a paragraph to indicate that he wanted to text with Ivy, an automated concierge that sends informational and marketing text messages that may be sent by an automatic dialing system.

The page includes two other paragraphs.  One addresses Horseshoe's right to access the room and states that the guest's provision of an email address opts in to receipt of marketing communications.  The other paragraph, invoked by Horseshoe, states that by signing below the guest agrees to several terms and conditions.  Among them are the authorization of credit card charges for the room, liability for damage, checkout rules, prohibition of controlled substances, and cleaning fees for smoking.  The paragraph then sets forth the language cited by Horseshoe:

> You agree that any legal claims involving the Telephone Consumer Protection Act and/or related state and federal laws that you have against hotel or that hotel has against you must be submitted to binding, confidential arbitration before a neutral JAMS arbitrator and that you and hotel each waive a trial by jury.

The form provides a space for the guest to provide an email address and a signature. Plaintiff wrote something illegible in the email space and drew a large X over the guest signature space.

The first issue is whether the parties entered into any arbitration agreement at all. That issue is governed by Louisiana law, and the burden is on Horseshoe to prove consent and the other elements of a contract under state law.  Consent may be made orally, in writing, or by action or inaction.  Briggs v. Populas Fin. Grp., Inc., 2023 WL 5005547, *4 (W.D. La. 2023).  The issue cannot be resolved in Horseshoe's favor on the showing made. The document presented states that the guest, "[b]y signing below," agrees to certain terms including the arbitration provision.  Plaintiff wrote a large X over the signature blank, so it cannot be said with any certainty that he entered into a contract.  More facts regarding Plaintiff's intent and the performance of the parties would be required to resolve that issue.

Even if it is assumed that a contract was formed, the claims presented in this civil action do not fall within the scope of the arbitration provision.  Plaintiff's complaint sets forth federal counts based on alleged violations of 42 U.S.C. § 1981 (race discrimination in making contracts) and Title VII (public accommodation), as well as state law claims based on a Louisiana statute similar to Title VII, intentional infliction of emotional distress, breach of a contractual obligation of good faith, and battery.

None of Plaintiff's claims involve the Telephone Consumer Protection Act (TCPA) and/or related state and federal laws.  Horseshoe argues that the arbitration clause is broad and encompasses "any legal claims" arising out of state or federal law.  That, however, is not what is stated by the plain language of the agreement that Horseshoe wrote.  The document refers specifically to text and email marketing, possibly by automated dialing, and the arbitration language requires arbitration only of legal claims "involving" the TCPA and/or related laws.  The TCPA restricts the making of telemarketing calls and the use of

automatic telephone dialing systems.  There is no reasonable construction of the relevant language that would yield the result suggested by Horseshoe.  The request to compel arbitration should be denied.

**Rule 12(b)(6) Burden**

Horseshoe makes a Rule 12(b)(6) challenge to each count of the complaint for failure to state a claim on which relief may be granted.  In assessing such challenges, the court must accept as true all well-pleaded facts in the complaint and view those facts in the light most favorable to the plaintiff.  In re Katrina Canal Breaches Litigation, 495 F.3d 191, 205 (5th Cir. 2007).  Those facts must state a claim that rises above the speculative level and is plausible on its face.  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007); Amacker v. Renaissance Asset Mgmt., LLC, 657 F.3d 252, 254 (5th Cir. 2011).  A complaint is not sufficient if it offers only "labels and conclusions," or "a formulaic recitation of the elements of a cause of action."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 127 S.Ct. at 1965).

**Section 1981 Claim**

Horseshoe attacks the adequacy of Plaintiff's allegations of a claim under Section 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts."  42 U.S.C. § 1981(a). "Make and enforce contracts" is defined as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  § 1981(b).  To establish a Section 1981 claim for contractual discrimination, Plaintiff must allege that (1) he is a member of

a racial minority; (2) Horseshoe intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute.  Body by Cook, Inc. v. State Farm Mut. Auto. Ins., 869 F.3d 381, 386 (5th Cir. 2017).

Horseshoe challenges only the second element, that Horseshoe intended to discriminate on the basis of race.  It argues that the allegations in the complaint do not suffice because they allege only that Plaintiff and the Horseshoe employees were of a different race.  But the complaint alleges more.  Plaintiff alleged that Horseshoe's general manager had articulated an intent to keep African Americans from the swimming pool area and had implemented a policy of discouraging or denying African American customers admission to all areas of the establishment while offering admission to similarly situated white patrons.  Plaintiff alleged that the white employees demanded that he produce a photo ID and ultimately had him arrested based on his failure to comply.  Plaintiff alleged that he noticed that he was the only African American in the swimming area and that white patrons were being allowed to use the pool without being required to show picture identification.

To prevail on a Section 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." Comcast Corp. v. National Association of African American-Owned Media, 140 S.Ct. 1009, 1019 (2020).  The Comcast decision stated that it is relevant to ask "what would have happened if the plaintiff had been white?"  Id. at 1015.  If the defendant would have responded the same way if the plaintiff had been white, then the plaintiff received the same legally protected right as a white person.  "Conversely, if the defendant would have

responded differently but for the plaintiff's race, it follows that the plaintiff has not received the same right as a white person." Id.

Plaintiff's allegations set forth a plausible case that Horseshoe treated him differently because of his race and based on a general policy of excluding African Americans from the pool area. The plaintiff in Body by Cook was held to have pleaded an adequate Section 1981 claim when it alleged that the plaintiff company met all requirements to participate in a State Farm repair program, State Farm told the plaintiff that it was not admitting body shops into the program, but State Farm then admitted a non-minority-owned body shop with inferior equipment that did not meet the program's alleged qualifications. The allegations that similarly situated plaintiffs were treated differently made plausible the inference that the difference in treatment was because of the plaintiff's minority status. Body by Cook, 869 F.3d at 387. Plaintiff's allegations with respect to the second element of his Section 1981 claim are sufficient for similar reasons, so Horseshoe's motion to dismiss should be denied in this respect.

**42 U.S.C. § 2000a**

Plaintiff's complaint sets forth a count for unlawful discrimination in violation of 42 U.S.C. § 2000a. The statute provides that all persons shall be entitled to the full and equal enjoyment of accommodations of any place of public accommodation without discrimination of segregation on the ground of race. Section 2000a-2 states that no person shall deny or deprive any person of a right or privilege secured by Section 2000a or Section 2000a-1. Section 2000a-3(a) allows for a civil action for certain relief in connection with acts or practices prohibited by Section 2000a-2.

Horseshoe challenges the count on two grounds. First, it urges that Plaintiff has not complied with the notice requirement of Section 2000a-3(c). That statute provides that no civil action may be brought under subsection (a) before the expiration of 30 days after written notice of such alleged act or practice has been given to appropriate state authorities. Horseshoe's second argument is that Plaintiff has not alleged sufficient facts to allege a plausible claim for a violation of the public accommodation statute.

Plaintiff's response addresses only the procedural attack. He notes that Section 2000a-3(c) allows that "the court may stay proceedings in such civil action pending the termination of State or local enforcement proceedings." He asks that the court stay the matter for 45 days rather than dismiss the claim. Plaintiff does not represent that he previously sent such notice, and his argument implies that he had not yet initiated that action. His brief was filed more than 45 days ago, and there is no indication in the record that Plaintiff has given the requisite notice in the intervening time. Plaintiff's response did not at all address the substantive attack on this claim.

Under these circumstances, it is recommended that the court dismiss Count Two of the complaint, which alleges a claim under 42 U.S.C. § 2000a, without prejudice based on the lack of pre-suit notice. If Plaintiff attempts to cure this notice issue by later amendment, he will have to explain the specific basis for a claim under the statutes, address Horseshoe's attacks on the adequacy of his allegations, and explain why he did not brief those issues in connection with this motion.

**Louisiana Human Rights Act, La. R.S. 51:2247**

Plaintiff's complaint alleges that Horseshoe violated La. R.S. 51:2247, which states that it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of the services, privileges, and accommodations of a place of public accommodation on the grounds of race or color.  Section 2264 allows for a civil action to enjoin further violations and to recover actual damages sustained.  The Act "does not require a plaintiff alleging discrimination by a place of public accommodation to show intentional discrimination." Smith v. France, 850 Fed. Appx. 243, 248-49 (5th Cir. 2021).  Plaintiff notes that the Act lacks a prior notice provision, which avoid the prematurity defense that applied to the similar federal claim.

Horseshoe faults the complaint for lack of any direct allegations of race discrimination or allegations that its employees referred to Plaintiff's race.  But the complaint does include allegations that Horseshoe had a policy of excluding African American guests from the pool area and that this policy was carried out by the insistence that Plaintiff show photo ID, a requirement that was not made of white guests in the pool area.  These allegations are sufficient to state a plausible claim for violations of the Louisiana statutes and distinguish this case from Harrison v. Vici Properties, Inc., 2022 WL 3586754 (E.D. La. 2022), cited by Horseshoe, which granted a motion to dismiss a claim by a black female patron who was denied entrance to a casino because her Louisiana driver's license would not scan and her military ID was declined because it looked fake.  A key distinction is that the plaintiff in Harrison did not allege that white patrons were

allowed in without ID.  That factor may have well changed the result, and it warrants a different result in this case.  Horseshoe's motion to dismiss this claim should be denied.

**Intentional Infliction of Emotional Distress**

Plaintiff's complaint sets forth a count that alleges intentional infliction of emotional distress in violation of Louisiana tort law.  Horseshoe challenges the adequacy of Plaintiff's allegations.  Horseshoe's motion should be granted with respect to this claim.

To recover under Louisiana law for intentional infliction of emotional distress, a plaintiff must prove (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that such distress would be certain or substantially certain to result from his conduct.  White v. Monsanto Co., 585 So.2d 1205, 1209 (La. 1991).  The conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Id.  Many such claims arise in the workplace, but ordinary employment disputes, even those involving discrimination and sexual harassment, will rise to this level only in the most unusual of cases, such as those that involve a pattern of deliberate, repeated harassment over a period of time.  Nicholas v. Allstate Ins. Co., 765 So.2d 1017, 1026-27 (La. 2000).  This was not a workplace conflict, but the requirements to state a claim in that setting provide guidance in this case.

Plaintiff argues that he was denied the use of the pool, which was an advertised amenity of the hotel, and Horseshoe employees called the police on him and elected to press charges.  Conduct such as that alleged may be actionable under anti-discrimination

laws, but what is described is not so outrageous as to go beyond all possible bounds of decency and give rise to a viable claim of intentional infliction of emotional distress. The complaint also lacks any allegation that Horseshoe's conduct was intended to cause the kind of severe emotional distress that must be present to support such a claim. There are scores of court decisions from federal and Louisiana courts that have assessed similar claims, with most of them being rejected. Plaintiff has not pointed to any decisions that recognized facts such as what he alleged to give rise to a plausible claim for this variety of tort. This count should be dismissed.

**Breach of Contract**

Plaintiff's complaint includes a count for breach of contract, which Horseshoe argues is based on mere conclusory statements and should be dismissed. Plaintiff responds that there was an implied contractual agreement between Plaintiff and Horseshoe, as the operator of the hotel, for Plaintiff to be a guest in the hotel. Horseshoe allegedly breached the contract by removing Plaintiff from the premises prior to the scheduled expiration of his stay. These allegations give rise to a plausible claim for breach of contract that may proceed beyond the pleadings review stage.

**Battery**

The final count of Plaintiff's complaint alleges that Horseshoe is liable, under the theory of respondeat superior, for the tort of battery based on Horseshoe employees making harmful or offensive contact with Plaintiff. Plaintiff alleges that he was arrested by a police officer on the Horseshoe premises and, during the arrest, Robert Prime, a Horseshoe security officer, placed his fist and knee on Plaintiff's back after Plaintiff was restrained

and handcuffed.  Horseshoe does not argue that these facts do not allege a battery by Prime.  Rather, Horseshoe argues that the complaint does not allege adequate facts to show that it is responsible for Prime's actions.

Louisiana law provides that an employer is liable for a tort committed by his employee if, at the time, the employee was acting within the course and scope of his employment.  "The course of employment test refers to time and place."  Baumeister v. Plunkett, 673 So.2d 994, 996 (La. 1996).  "The scope of employment test examines the employment-related risk of injury."  Id.  Relevant factors include (1) whether the act was primarily employment rooted, (2) whether the violence was reasonably incidental to the performance of the employee's duties, (3) whether the act occurred on the employer's premises, and (4) whether it occurred during the hours of employment.  Not all four factors must be met before liability may be found, and the "particular facts of each case must be analyzed to determine whether the employee's tortious conduct was within the course and scope of his employment."  Id. at 996-97.

Plaintiff alleges that a security officer made physical contact with a guest who was being arrested on the hotel premises.  The allegations suggest that this took place during the security officer's work hours.  Such actions could be deemed incidental to the performance of a security guard's duties.  Plaintiff has alleged sufficient facts to present a plausible claim that Horseshoe is vicariously liable for the actions of Mr. Prime, so its motion should be denied with respect to this claim.

Accordingly,

It is recommended that Horseshoe's Motion to Compel Arbitration and to Dismiss for Failure to State a Claim (Doc. 8) be granted in part by dismissing without prejudice Count Two of Plaintiff's complaint that asserts a violation of 42 U.S.C. § 2000a and dismissing with prejudice for failure to state a claim on which relief may be granted Count Four of the complaint that asserts a claim of intentional infliction of emotional distress.  It is recommended that the motion be denied in all other respects.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 16th day of November, 2023.

Mark L. Hornsby
U.S. Magistrate Judge